# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

SYNERGY CHC CORP.,

      Plaintiff

      v.

HVL, LLC, d/b/a Atrium Innovations,

      Defendant

Case No. 2:22-cv-00301-JAW

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff Synergy CHC Corp. ("Synergy") complains against Defendant HVL, LLC d/b/a Atrium Innovations ("Atrium") as follows:

## INTRODUCTION

1.    This dispute concerns the unilateral, self-serving decision of a contract manufacturer to stop production of a customer's products in favor of the production of its own products.

2.    Synergy sells products under "FOCUSfactor," a brain health supplement brand, to big box retailers for sale to consumers ("FOCUSfactor Products").

3.    Atrium has been engaged in the contract manufacturing of FOCUSfactor Products for approximately two decades.

4.    In 2020, however, Atrium paused the manufacture of FOCUSfactor Products in favor of its own products and/or third-party products without any notice to Synergy.

5.    To induce Synergy to rely on and continue to do business with Atrium and not seek out an alternative third-party manufacturer, and to gain a market advantage for Atrium's own products at the expense of de-prioritizing the production and shipment of FOCUSfactor Products,

Atrium repeatedly and falsely represented to Synergy that the production of FOCUSfactor Products was a priority and that shipments of FOCUSfactor Products would be immediately forthcoming.

6.   Atrium understood that Synergy would rely on its representations regarding the production and delivery of FOCUSfactor Products to fulfill Synergy's purchase orders; in fact, Synergy did reasonably rely on Atrium's representations.

7.   In reliance on Atrium's representations, Synergy expected Atrium to timely deliver FOCUSfactor Products for then-pending purchase orders from Synergy's clients and it did not seek out an alternative third-party manufacturer.  However, Atrium failed to deliver FOCUSfactor Products for then-pending purchase orders from Synergy's customers for months.

8.   Atrium's representations that it was prioritizing and continuing to manufacture and deliver FOCUSfactor Products pursuant to promised terms for pending purchase orders proved to be false, reckless, and misleading.

9.   As a result, Synergy ran materially low on FOCUSfactor Products inventory and had to short-ship and even skip shipments of FOCUSfactor Products to its customers.  This caused Synergy to be unable to fill more than $5 million of its customers' purchase orders for FOCUSfactor Products in 2020 and 2021, which Synergy's customers cancelled.

10.   After Atrium continued to fail to timely deliver Synergy's FOCUSfactor Products, Synergy lost "turn" sales due to FOCUSfactor Products not being in the stores for additional millions of dollars.

11.   When Atrium finally did deliver the FOCUSfactor Products that Synergy had ordered months before, Synergy discovered that the shelf life for the FOCUSfactor Products had been materially diminished because the product (in its various stages) sat for months at Atrium's

and/or its sub-contractor's location before manufacturing of FOCUSfactor Products was completed.

12.     In fact, Atrium stopped sending shipment and release records—in accordance with parties' course of dealing—for the FOCUSfactor Products that were short-dated.

13.     Upon information and belief, Atrium purposefully did not send the shipment and release records for the short-dated FOCUSfactor Products with the intent to actively conceal this fact.

14.     Synergy thus brings this action for the damage caused to it by Atrium's false and misleading representations and late delivery of deficient FOCUSfactor Products in excess of $10 million.

<u>**PARTIES AND JURISDICTION**</u>

15.     Synergy CHC Corp. is a Nevada corporation with its headquarters and principal place of business in Westbrook, Maine.

16.     Upon information and belief, HVL, LLC d/b/a Atrium Innovations is a Delaware limited liability company with its principal place of business in Pittsburgh, Pennsylvania.

17.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because it is a dispute between citizens of different states where the amount in controversy exceeds $75,000.

18.     The Court has personal jurisdiction over Atrium because Atrium engaged in and transacted business within and contracted to supply and did deliver products within this judicial district.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because Atrium engaged in and transacted business within and contracted to supply and did deliver products within

this judicial district, or, alternatively, pursuant to 28 U.S.C. sect. 1391(b)(3) because Atrium is subject to personal jurisdiction here.

## FACTUAL ALLEGATIONS

### I.    Overview of the Contract Manufacturing Relationship Between Synergy and Atrium.

20.    Synergy is a consumer healthcare and beauty company with sales in the United States and Canada.

21.    Among other products, Synergy sells FOCUSfactor Products, a brain health supplement brand.

22.    For the nine-month period of time ending September 30, 2021, sales of FOCUSfactor Products represented a large percentage of Synergy's net revenue.

23.    Atrium manufactures and delivers certain products both for itself and, historically, for third-party customers.

24.    For approximately twenty (20) years, Atrium produced FOCUSfactor Products as a contract manufacturer organization, whereby Atrium would manufacture and deliver various quantities of the FOCUSfactor-brand brain health supplements.

25.    Atrium's manufacturing process generally involved procuring the materials that make up FOCUSfactor Products, batching the materials into, *e.g.,* tablets, bottling the product, testing raw materials and finished products, and then boxing and shipping FOCUSfactor Products.

26.    Atrium's manufacture of FOCUSfactor Products for Synergy had been performed pursuant to specifications agreed to by the parties.

27.    FOCUSfactor Products is a proprietary blend of uniquely prepared ingredients formulated to promote brain health. The quantities, ratios, and methodology of producing and

manufacturing FOCUSfactor Products is a trade secret, which was confidential information entrusted with Atrium.

28.     The first page of redacted copies of bulk specifications for the FOCUSfactor Products produced by Atrium for Synergy, FOCUSfactor Adult Extra Strength, FOCUSfactor Kids Extra Strength, FOCUSfactor Brain and Vision, FOCUSfactor Adult, and FOCUSfactor Kids Mixed Berry (collectively the "Bulk Specifications") are attached hereto as **Exhibit A**.

29.     The Bulk Specifications required that the shelf life for each product other than FOCUSfactor Adult Extra Strength be thirty (30) months, and the shelf life for FOCUSfactor Adult Extra Strength be thirty-six (36) months.

30.     As part of the parties' course of dealing, Atrium regularly shipped FOCUSfactor Products to Synergy (or its customers) such that the manufacturing and shipping process only used up two months or less of the shelf life for the products.

31.     The shelf life, and the delivery of FOCUSfactor Products within the first two months of the shelf life, was a material term of the contract manufacturing relationship between Atrium and Synergy.

32.     This is because Synergy and its customers need this period of time for the process of selling its products.  Specifically, once the FOCUSfactor Products were delivered by Atrium to Synergy, Synergy had to sell the FOCUSfactor Products to third-party retailers, who then put the product in their store (physically or online) and sold it to the end user.

33.     Synergy's customers generally did not and will not accept delivery of any FOCUSfactor Products whose expiration date is less than twelve (12) months from the date of that product's delivery to the customer.

34.     Synergy's customers, however, want Synergy to ship FOCUSfactor Products to them with between twenty-four (24) to thirty (30) months of shelf life.

35.     The parties' contract manufacturing relationship was governed by a purchase order and acknowledgment process, whereby Synergy would issue purchase orders to Atrium for the manufacture of certain quantities of its FOCUSfactor Products, Atrium would acknowledge the purchase orders, and Atrium would thereafter manufacture the FOCUSfactor Products, deliver them to Synergy, and invoice Synergy for the products.

36.     Atrium's acknowledgments also contained a "Promised Ship Date", which is a material term and the date that Atrium promised to ship the FOCUSfactor Products.

37.     Prior to the issues described in this Complaint, Atrium usually complied with the delivery dates on Synergy's purchase orders and Atrium seldomly committed any material breaches of the contracts between the parties.

38.     Atrium also informed Synergy of its the promised ship dates on its acknowledgements of Synergy's purchase orders.

39.     During weekly meetings between representatives of the parties, Atrium kept Synergy informed of the status of purchase orders, including production, delivery schedules, and other relevant updates.

40.     During the course of their contract manufacturing relationship, Atrium would typically deliver the FOCUSfactor Products it produced within two months of its production.

**II.     Atrium Began to Delay the Manufacture and Delivery of FOCUSfactor Products in Favor of Its Own Brand.**

**A.     Synergy Ordered FOCUSfactor for 2020 and 2021 from Atrium.**

41.     In or about the spring of 2020, Atrium began delaying the manufacture and delivery of FOCUSfactor Products to Synergy.

42.     Specifically, Synergy issued the following purchase orders to Atrium in the regular course of the parties' relationship (the "Purchase Orders"):

a.   HVL PO4, issued on April 17, 2020;

b.   HVL PO5, issued on May 27, 2020;

c.   HVL PO6, issued on August 26, 2020;

d.   HVL09302020, issued on September 30, 2020;

e.   HVL09302020A, issued on September 30, 2020;

f.   HVL PO7, issued on November 5, 2020;

g.   HVL PO8, issued on November 6, 2020;

h.   HVL PO9, issued on December 3, 2020; and

i.   HVL20211801, issued on January 18, 2021.

43.     The Purchase Orders sought more than $14 million of FOCUSfactor Products from Atrium.

44.     The FOCUSfactor Products ordered from Atrium by Synergy through the Purchase Orders represented the vast majority of FOCUSfactor Products that Synergy intended to sell in the second half of 2020 and 2021, and for which Synergy received purchase orders from its customers.

45.     Atrium accepted the terms of the purchase orders and acknowledged receipt of these Purchase Orders in writing, which included and acknowledged a "Promised Ship Date" for the products (collectively as the "Purchase Contracts").

46.     The Acknowledgements were typically submitted months in advance—often a six (6) to nine (9) months' notice—of the Promised Ship Dates, affording Atrium ample time to order and procure all necessary ingredients, materials, and labor needed to meet its deadlines.

47.     True and accurate copies of Synergy's purchase order and Atrium's acknowledgements for HVL PO5 are attached hereto as **Exhibit B**.

48.      True and accurate copies of Synergy's purchase order and Atrium's acknowledgements for HVL PO6 are attached hereto as **Exhibit C**.

49.     True and accurate copies of Synergy's purchase order and Atrium's acknowledgements for HVL09302020 are attached hereto as **Exhibit D**.

50.     True and accurate copies of Synergy's purchase order and Atrium's acknowledgements for HVL09302020A are attached hereto as **Exhibit E**.

51.     True and accurate copies of Synergy's purchase order and Atrium's acknowledgements for HVL PO7 are attached hereto as **Exhibit F**.

52.     True and accurate copies of Synergy's purchase order and Atrium's acknowledgements for HVL PO8 are attached hereto as **Exhibit G**.

53.     True and accurate copies of Synergy's purchase order and Atrium's acknowledgements for HVL PO9 are attached hereto as **Exhibit H**.

54.     True and accurate copies of Synergy's purchase order and Atrium's acknowledgements for HVL20211801 are attached hereto as **Exhibit I**.

55.     Atrium accepted the purchase orders identified in Exhibit B-I (collectively as the "Purchase Orders") without objecting to their terms by executing Atrium's acknowledgements identified in Exhibit B-I (collectively as the "Acknowledgments").

56.     Atrium's acceptance through the Acknowledgments of the Purchase Orders was consistent with its past course of dealing with Synergy.

57.     Synergy believed and relied on Atrium's representations to Synergy and that Atrium would manufacture the FOCUSfactor Products pursuant to the material terms of the

Purchase Contracts, which was consistent with its past course of dealing and the terms of the Purchase Orders.

58.     The material terms of the Purchase Contracts included both (1) the delivery of the FOCUSfactor Products consistent with the "Promised Ship Date" identified in the Purchase Contracts and (2) the delivery of the FOCUSfactor Products within two months of the start of its shelf life.

59.     At the time that the parties entered into the Purchase Contracts, Atrium did not inform Synergy that there would be any delays in the manufacture or delivery of the FOCUSfactor Products from the "Promised Ship Dates" represented in the Purchase Contracts.

**B.     Atrium Unilaterally Delayed Production of the FOCUSfactor Products in Favor of its Own Products and in Breach of the Purchase Contracts.**

60.     Shortly after Atrium received each of the Purchase Orders, Atrium should have begun the manufacturing process for making the ordered FOCUSfactor Products pursuant to the Purchase Contracts.

61.     However, in or about late spring or early summer 2020 Atrium unilaterally paused the manufacturing process for the Purchase Contracts after the manufacturing process for FOCUSfactor Products were already initiated but before the manufacturing process was completed.

62.     The reason Atrium unilaterally stopped the manufacturing process for Synergy's products was so that Atrium could utilize its materials, manufacturing equipment, and labor to prioritize and produce more of its own products (and/or third parties' products) instead of the FOCUSfactor Products.

63.     Upon information and belief, at this time, Atrium also knew (but did not disclose to Synergy) that it would be stopping its contract manufacturing work for Synergy in 2022.

64.     In early summer 2020, Atrium began to inform Synergy that the manufacture of its FOCUSfactor Products was delayed in some respect.  Rather than telling Synergy the truth – that Atrium was prioritizing the manufacture of its products (and/or third parties' products) over Synergy's products and that the delay would be for months—Atrium gave various false reasons for the delayed production. Atrium also strung Synergy along to believe that the delay would be imminently resolved. These included COVID, testing delays, supply chain challenges, staffing problems, and issues sourcing raw materials.

65.     Initially, when Synergy inquired about the status of specific Purchase Orders during the weekly meetings of Atrium and Synergy representatives, Atrium repeatedly assured Synergy that the manufacturing of the FOCUSfactor Products was continuing and that deliveries of then-pending orders of FOCUSfactor Products were forthcoming. However, these assurances were intentionally false and were made in order to mislead Synergy into believing that these delays were an exception, would be promptly corrected, would not be an ongoing issue, and/or Atrium would be able to produce and ship FOCUSfactor Products as promised under the Purchase Contracts. Therefore, Synergy relied on these assurances by submitting additional purchase orders with Atrium.

66.     As the delays continued, Synergy continued to inquire about pending Purchase Orders that it had not received in accordance with the Purchase Contracts. After months of Atrium's excuses, lies, and other delay tactics, representatives of Atrium, including high-level officers of Atrium, *i.e.*, Anthony Wasson, advised Jack Ross of Synergy via telephone on multiple occasions that Atrium was prioritizing Synergy's pending Purchase Orders of FOCUSfactor Products.

67.     During status meetings and calls in the summer 2020, there was discussion between the parties regarding, whether as a result of Atrium's delays, Synergy should contract a different manufacturer.  Each time, Anthony Wasson of Atrium advised Synergy that moving to a different manufacturer was not necessary.

68.     Synergy believed and reasonably relied on Atrium's representations to Synergy that Atrium would continue to manufacture the FOCUSfactor Products as ordered and pursuant to the Purchase Contracts, which was consistent with its past course of dealing and the terms of the Purchase Orders.

69.     In July 2020, Synergy began to notice that it was running dangerously low in its FOCUSfactor Products due to Atrium's delay in producing and shipping these products as scheduled and in accordance with the Promised Ship Dates under the Purchase Contracts.

70.     On or around this time, aside from vague assurances, Atrium became less transparent and communicative regarding the production and shipment of FOCUSfactor Products, which was inconsistent with the parties' past course of dealing and relationship.

71.     Atrium became increasingly evasive in its responses and gave vague and/or misleading answers whenever Synergy asked follow-up questions related to the delays in production and shipment of the FOCUSfactor Products.

72.     For example, sometime in July of 2020, Jane Merglowski ("Merglowski"), the National Accounts Manager in Atrium's Contract Manufacturing Division, began to give evasive, vague, and misleading responses when Synergy let Atrium know that it was dangerously low in inventory and showed great concern over Atrium's delay.

73.     On July 14, 2020, Merglowski stated that she just "received an update on the raw materials, bottles and closure this morning" and would put together a status update on when

11

Synergy could expect more product. Merglowski also stated that there would be material delays in the shipments of products already manufactured but did not actually provide a reason for these delays. Furthermore, Merglowski stated that there may be issues with future production because they did not have sufficient bottles and closures.

74.     Generally, Synergy submitted its purchase orders at least six (6) to nine (9) months before Atrium promised to deliver FOCUSfactor Products.

75.     Merglowski failed to explain why Atrium was low on bottles and closures despite having at least six (6) to nine (9) months of advance notice to procure all supplies needed to fill Synergy's purchase orders.

76.     On July 17, 2020, Synergy continued to ask for additional updates related to the ongoing issues and delays in producing and shipping the FOCUSfactor Products.

77.     On July 20, 2020, Merglowski responded and stated that she did not have any further updates other than that Atrium spoke with their "rep regarding bottles" and that Atrium was "working closely with planning/supply chain as well." Atrium provided no further information to Synergy so that it could understand what specific discussions were had, why they ran out of these materials, what "working closely with planning/supply chain" meant, and how this would solve their current problem of delays.

78.     On July 21, 2020, in response to Synergy's email, Merglowski stated that there was another delay in the shipment of inventory because Atrium was waiting for test results and the products to be released by its lab.

79.     On the same date, Tony Wasson ("Wasson"), the Executive Vice President of Atrium, emailed Synergy assuring that Atrium "organized a call with the bottle/closure supplier last week" and that there were "[p]ositive results from this call".

12

80.    Again, no further information was provided that would provide an understanding of these "positive results" and what this meant for the delays and current backorders.

81.    Wasson merely copied and pasted an email from their bottling/closure supplier, who stated that they will do an inventory level review and be well stocked to accommodate Synergy's needs and growth in 2020 and into 2021. However, the supplier's email did not corroborate that there were any delays or backorders in bottles and closures.

82.    The copied and pasted email from Atrium's bottling/closure supplier was an attempt to convince Synergy that there was a supply chain issue, that it was now properly addressed, and that there would be no further delays in the future. Synergy relied on these representations.

83.    Upon information and belief, Atrium was beginning to actively conceal the true issues and reasons for the delays in the production and shipment of FOCUSfactor Products, which was that it was prioritizing the production and shipment of its own internal products and/or third-party products.

84.    On July 21, 2020, Merglowski emailed Synergy that Atrium would like to reschedule their regularly scheduled phone calls to occur every other week as opposed to once a week.

85.    Atrium did not provide a reason for this sudden change. Upon information and belief, Atrium was attempting to reduce the number of phone calls with Synergy in order to evade hard questions. Avoiding the regularly scheduled calls was just another delay tactic and a way for Atrium to actively conceal the truth from Synergy.

86. Synergy told Atrium that it was not comfortable with switching their weekly scheduled phone calls to every other week because of the number of material issues and delays that Atrium was causing.

87. On or around July 22, 2020, and on a phone call between the parties, Wasson stated that it engaged a third-party vendor to provide the preblended ingredients for FOCUSfactor Products starting "next week" pending some paperwork and that Atrium also bought a huge blender for its in-house manufacturing facility to address Synergy's production demands.

88. Upon information and belief, Atrium made these assurances and representations in order to intentionally mislead Synergy into believing that it had now resolved and corrected the ongoing delays in production and shipping of FOCUSfactor Products.

89. On July 30, 2020, Wasson emailed Synergy stating that Atrium's primary vendor for supplying minerals was experiencing delays in shipping raw materials. Wasson also stated that these shortages were due to the COVID-19 pandemic and that these same shortages were being experienced by the entire supplement industry.

90. Upon information and belief, Wasson's statements regarding the industry wide shortage of raw materials were false. These statements were falsely and intentionally made in order to mislead Synergy into believing that the disruption of producing FOCUSfactor Products should be excused due to shortages caused by the COVID-19 pandemic. Atrium also wanted Synergy to believe that the shortages and delays were an industry wide problem in order to prevent Synergy from finding an alternative manufacturer. Synergy relied on these representations by continuing to submit future purchase orders with Atrium.

91. However, upon information and belief, Atrium had the ability to procure the raw materials it needed to produce the FOCUSfactor Products. To the extent that Atrium did, in fact,

experience any in-house shortage, Atrium had access to many alternative solutions, including, but not limited to, reaching out to other vendors within their network, and/or any of their sourcing teams at one of their sister companies. In fact, Atrium intentionally made no statements regarding any efforts in working with their other vendors or sister companies to supply the needed minerals.

92.     Atrium is a global brand with massive purchasing power and large sourcing teams.

93.     Atrium was able to procure any raw materials, supplies, and labor it needed to produce, manufacture and ship FOCUSfactor Products with reasonable diligence.

94.     It is a standard industry practice for companies such as Atrium to source an alternate raw material or supplier, which has been done prior to the COVID-19 pandemic and is also fairly routine in manufacturing practices.

95.     Atrium's long-term plan was to gain a market advantage for its own internal branded products by internally edging out FOCUSfactor Products, sabotage the production of FOCUSfactor Products in order to ruin Synergy's relationships with its customers, and squeeze out Synergy and/or FOCUSfactor Products as a competitor for the same resources in the supplement industry.

96.     Atrium saw that the COVID-19 pandemic was an explosive time for growth for its internal product and therefore intentionally de-prioritized its contractual obligations to Synergy pursuant to the Purchase Contracts.

97.     In order to avoid legal liability for its breach of the Purchase Contracts, Atrium (1) falsely represented that the delays in producing and delivering FOCUSfactor Products were due to shortages and delays outside of its control, and (2) actively concealed that it was pouring all its resources—*i.e.*, labor, machinery, raw materials, lab testing, shipping trucks—towards growing Atrium's business at the expense of Synergy's business and reputation.

98.     In doing so, Atrium prioritized the use of raw materials, machines, testing labs, manpower, and/or other resources needed for the production of Atrium's own products and/or other third-party brands.

99.     However, in order to string Synergy along, Atrium devised a scheme to blame the delays and breaches of its contractual obligations on the COVID-19 pandemic and global shortages in order to create the illusion that Atrium's obligation to perform under the Purchase Contracts were excusable. Synergy relied on Atrium's representations by continuing to submit purchase orders. Synergy's misrepresentations also prevented Atrium from seeking remedies for its breach of the Purchase Contracts sooner, causing Synergy's damages to worsen.

100.    The delays in shipping FOCUSfactor Products continued. Whenever Synergy followed up with Atrium for more updates, Atrium refused to commit to a date on which the FOCUSfactor Products would be manufactured and delivered. Instead, Atrium continued to fraudulently and intentionally misled Synergy by making various false excuses and reasons for its delay—*i.e.,* blaming third parties, lab testing, or industry wide issues that are outside their control—when in fact the delays were indeed within Atrium's own control and/or preventable with reasonable diligence.

101.    On August 3, 2020, Merglowski emailed Synergy and stated that "while [Atrium] had planned on making 3 million bulk pills of the Extra Strength formula [Atrium] only received enough [raw materials] to make 950,000 pills." Merglowski also stated that "[t]he rest of the [raw materials were] tentatively due this week which would put the next 2 bulk batches (~2 million pills) to the end of August".

102.    Upon information and belief, Atrium had sufficient raw materials in-house to produce 3 million bulk pills as planned had Atrium not prioritized using the raw materials for its own internal brand products and/or third-party brand products.

103.    On August 4, 2020, Atrium, through Merglowski, emailed Synergy and again blamed the delays on Atrium's supplier for raw materials, that the supplier was "not committing to hard dates," and that Atrium otherwise lacked information as to the status of the procurement of the raw materials to produce FOCUSfactor Products.

104.    On August 5, 2020, Merglowski emailed Synergy and again stated that the ongoing delay in filling the Purchase Orders were because "[t]here [were] a few raw materials [that Atrium was] still struggling through with the suppliers and reliable ship dates."

105.    Upon information and belief, Merglowski's statements made between August 3-5, 2020 were false. Atrium intended to fraudulently mislead Synergy into believing that the disruption of production and Atrium's lack of reliable and detailed information was the fault of third-party vendors as opposed to its own.

106.    Upon information and belief, at this time, Atrium continued to actively conceal the truth reason for the delays in producing FOCUSfactor Products as the demand to produce Atrium's own competing products continued.  At around this time and well into 2021, Atrium's own products—or other third-party brands—were competing to use the same manufacturing machines, raw materials, manpower, and/or other resources as FOCUSfactor Products.

107.    In August of 2020, Synergy continued to experience extremely low to zero levels of inventory for FOCUSfactor Products due to Atrium's ongoing delay in production and shipment of these products.

108.    On August 10, 2020, Jessica Gray ("Gray"), the Senior Specialist of Inside Sales in the Contract Manufacturing Division for Atrium, emailed Synergy and stated that there would be another delay in shipping FOCUSfactor Products because Atrium required additional testing before it was released for shipping. On August 11, 2020, Merglowski confirmed that the lot of FOCUSfactor Products still did not ship due to additional testing and that Atrium was still waiting for an update on when testing would be complete and the products be released for shipping.

109.    Atrium did not provide any reasons as to why additional testing was needed.

110.    Upon information and belief, Atrium's statements regarding lab delays were false and/or made with the intention to mislead Synergy and prevent Synergy from knowing the real reasons for the delays in the production and shipment of FOCUSfactor Products.

111.    Atrium was the one that made the decision to additionally test the FOCUSfactor Products and Atrium also directly handled lab testing at this time.

112.    Upon information and belief, there were no justified reasons for the additional testing and Atrium used this as an excuse to explain the undue delay in meeting the shipment deadlines. To the extent that FOCUSfactor Products did undergo additional testing, the true delay was because Atrium prioritized testing its own and/or third-party products. Furthermore, Atrium continued to prioritize using materials, machines, manpower, testing labs, and/or other resources for the production and shipment of Atrium and/or third-party products.

113.    On August 24, 2020, Jack Ross ("Ross"), Chairman and CEO of Synergy, emailed Atrium that Synergy's inventory levels for FOCUSfactor Products were a "total nightmare now" and that Synergy needed relief from the low inventory levels "somewhere and soon."

114.    In response and on the same date, Wasson emailed Ross back and stated: "As we have said many times, this is all minerals driven. WE can't make product while we are on

18

allocation to procure minerals. Ingredients are the nightmare for us." Wasson also stated that Atrium could not "control what the industry is experiencing due to this pandemic" and to "[s]peak to anyone in the industry and they will tell you they are struggling with supply chain issues to a rush on supplements."

115.     However, Wasson's statements were intentionally false in order to mislead Synergy into believing that the supply chain issues were the proximate cause for the delays.

116.     Furthermore, the supplement industry was not facing supply chain issues that would disrupt Atrium's ability to produce FOCUSfactor Products on time. Other suppliers and contract manufacturing operators in the supplement business were not facing these shortages. In fact, Synergy was able to easily find alternative ingredients and/or suppliers to address Atrium's purported shortages. Synergy was also amendable to alternate componentry (*i.e.*, bottles, closures, etc.).

117.     Despite Synergy's solutions and help in resolving Atrium's purported sourcing challenges, Atrium's excuses for the delays persisted. Atrium continued to breach the material terms of the Purchase Contracts by failing to ship FOCUSfactor Products by the Promised Ship Date.

118.     Instead, Atrium continued to rotate through a variety of other excuses—other than raw material shortages—to explain away the continuous delays in production and shipment of FOCUSfactor Products. Atrium continued to make representations that these types of delays were currently an industry wide problem in order to prevent Synergy from finding an alternative manufacturer. Synergy relied on these representations by continuing to submit future purchase orders with Atrium.

119.    Due to the ongoing excuses and in order to mitigate the continuous delays, Synergy submitted smaller purchase orders with Atrium. For each new purchase order submitted, Atrium continued to falsely represent that it had the ability to fulfill and meet the terms of the Purchase Contracts, which Synergy relied on.

120.    On August 26, 2020, Wasson emailed Ross asking why Synergy's purchase orders were "so small for just two months."

121.    Wasson's statement insinuated that past issues were now resolved and that if Synergy submits larger purchase orders, Atrium could now produce and ship larger purchase orders without any issues or delays.

122.    Upon information and belief, Wasson knew that these material delays would be ongoing and continuous for the foreseeable future.

123.    Despite this knowledge, Wasson misled, encouraged, and suggested that Synergy should still submit larger purchase orders with Atrium. Wasson's encouragement for larger purchase orders is another example of Atrium's attempt to sabotage Synergy's business and also actively conceal and mispresent Atrium's intention to continuously delay the production and shipment of FOCUSfactor Products. Furthermore, Atrium continued to string Synergy along so that it could increase fraudulently obtained revenue for services it did not intend to provide.

124.    On September 1, 2020, Merglowski informed Synergy that there was another delay in meeting its deadlines because there was a backlog in coating the pills.

125.    This is another example of the types of excuses and tactics that Atrium used in order to mislead Synergy into knowing the true reasons for the delays.

126.    Synergy informed Atrium and Merglowski that its business was in serious risk because Atrium continued to miss every single deadline on all FOCUSfactor Products and that

Synergy is now completely out of Extra Strength FOCUSfactor Products due to Atrium's failure to ship products by the Promised Ship Date.

127. On September 1, 2020, Synergy asked for confirmation that Extra Strength FOCUSfactor Products would ship that week and demanded that Atrium do everything it can, including removing other products from the manufacturing line, in order to ensure shipment.

128. On September 2, 2020, Merglowski informed Synergy by email of the additional delays. Merglowski stated that Atrium was going to have a phone call with supply chain and production next week in order to understand and formulate a plan for the remainder of the year.

129. Synergy informed Atrium that these delays have now jeopardized Synergy's relationship with its key customers and that these delays are not acceptable. Synergy demanded that Atrium escalate this issue to its highest levels in Atrium's chain of command given that these delays have created a full-blown emergency to Synergy's business.

130. Despite Synergy's notice of urgency, the delays in producing and shipping FOCUSfactor Products in accordance with the Purchase Contracts continued.

131. From September 2020 and into 2021, Atrium continued to push back the production and shipping dates as Atrium cycled through the same various excuses and lies.

132. Often times, Atrium would also cancel weekly phone calls—sometimes with little notice or reason—in an attempt to evade answering Synergy's hard questions.

133. By the end of 2020, Synergy was short shipping and/or not able to deliver FOCUSfactor Products to many of its key customers due to Atrium's delays.

134. The following excuses and statements are additional examples of the false and/or misrepresentations made by Atrium:

135.    On September 18, 2020, Synergy followed up with Atrium on a shipment of FOCUSfactor Products. Merglowski responded and stated that it did not get shipped on this day, despite Atrium's continued promise that it would. Merglowski blamed the delay on Quality Assurance's failure to release the FOCUSfactor Products on time for shipment.

136.    Synergy informed Atrium that this delay and mistake is unacceptable, especially since Synergy followed up with Atrium at least three (3) times on this day and Atrium knew this was an extremely important shipment to make.

137.    On September 21, 2020, Atrium informed Synergy that there would be delays in shipping FOCUSfactor Products due to being short staffed at their shipping dock.

138.    All the while, Atrium remained very evasive as to answering Synergy's follow up questions.

139.    On October 2, 2020, Wasson informed Synergy that they were working on "smoothing out a plan" with their supply chain department in order to resolve the ongoing delays. Despite these representations, ongoing delays continued.

140.    On and around October 5-6, 2020, Atrium continued to represent that some of the delays were attributed to issues with lab tests and it not being released for shipping.

141.    On October 7, 2020, without reason, Merglowski canceled the regularly scheduled weekly call between Synergy and Atrium for that day.

142.    Additionally, Merglowski suddenly changed Atrium's weekly reports to include only an updated shipping schedule and purposefully began to omit the production schedule of FOCUSfactor Products, which was critical information.

143.    Upon information and belief, this was part of Atrium's tactic and strategy to conceal the true reasons for delay in the production of FOCUSfactor Products. In or around this time, Synergy needed answers and Atrium continued to be evasive and/or untruthful.

144.    On October 20, 2020, Merglowski emailed Synergy with additional changes to the shipment schedule with the excuse that (1) one shipment was delayed because there was a "delay on the cartons", (2) a second shipment was delayed because of a single raw material, and (3) a third shipment was delayed because of lab testing.

145.    On October 27, 2020, Wasson informed Synergy that Atrium was facing ongoing delays in production due to shortages in raw materials and components. Wasson stated that there will be supply chain challenges well into the "Q2 and possibly Q3" for the items that Atrium would need to produce FOCUSfactor Products.

146.    Despite this representation and on the same date, Wasson informed Synergy that it would be tremendously helpful if Synergy can go ahead and place their orders for "Q2 and Q3" so that they could get ahead of these obstacles and order the materials that they would need ahead of time.

147.    On November 12, 2020, Merglowski informed Synergy that there were additional delays because Atrium was still waiting on "micro testing" and that the folic acid had to be retested in the Extra Strength FOCUSfactor Products for adults.

148.    Atrium remained vague as to providing a date on when the products would be shipped.

149.    Between the dates November 12th and 17th of 2020, Synergy was close to being out of certain lines of FOCUSfactor Products due to Atrium's delays and began to allocate what little product was available in order to maintain and/or salvage customer relationships.

150.    Atrium blamed such delays on the need for more data and research as it relates to its production.

151.    Between the dates November 13th and 18th of 2020, Gray told Synergy that there were delays in shipping FOCUSfactor Products because Atrium was unable to get a truck to ship the products.

152.    Once a truck was obtained, Atrium then blamed the delay in shipment of the products on the lab's failure to release the lab results on time.

153.    On November 18, 2020, Merglowski informed Synergy that there would be delays in producing certain lines of FOCUSfactor Products because of a shortage of 225cc Cobalt Blue bottles.

154.    On the same date, Wasson emailed Ross and told him that he understood Synergy's frustration with the constant traffic of supply chain issues interfering with the production of FOCUSfactor Products. Wasson also informed Ross that he was dealing with the same frustrations in ***producing Atrium's internal products and meeting the demands of Atrium's retail customers***. In this same email, Wasson provided Ross with several more updates on the manufacturing, bottling, testing, and shipping delays on FOCUSfactor Products. Wasson promised that Atrium would try to increase the floor stock or do a special run to hasten the production of FOCUSfactor Products.

155.    However, floor stock was never increased.

156.    Furthermore, upon information and belief, a special run to hasten the production of FOCUSfactor Products never occurred.

24

157.    On November 24, 2020, Merglowski told Synergy that there were additional delays with shipping and lab testing on certain FOCUSfactor Products. On November 25, 2020, Synergy informed Merglowski that it was critical that the shipment be made today.

158.    On the same date, Atrium indicated that the shipment would not be made until the next week. Ross responded that he does not understand the reason for this delay since this lot of products was released for shipment at least a week ago and that Synergy was in urgent need of these products.

159.    On November 30, 2020, Synergy followed up on the status of this shipment and Merglowski indicated that Atrium ordered a truck for today but was unable to promise that it would go out on this day due to ongoing issues with shortages in labor and trucks.

160.    On this same date, Merglowski acknowledged that FOCUSfactor Products were backordered and promised Synergy that the production and shipment of their products were being prioritized.

161.    On December 3, 2020, Synergy placed additional purchase orders for the year 2021. Merglowski responded by thanking Synergy for the ongoing business opportunities and stated that Atrium would have an internal discussion with supply chain and planning, as well as have external discussions with its vendors and suppliers before Atrium commits and accepts the terms of Synergy's purchase orders.

162.    Eventually, Atrium accepted Synergy's purchase orders and its material terms, including the shipping deadlines. Atrium's acknowledgment and acceptance of the material terms of the Purchase Contracts served as confirmation that Atrium made sure that its vendors and suppliers would be able to provide all ingredients, materials, labor, components, and services in order to meet the Promised Ship Dates.

163.    On December 3, 2020, Merglowksi indicated that there would be additional delays on shipping products due to lab retesting.

164.    Despite Synergy's ongoing request for updates, Atrium did not provide an estimated timeline of when the lab retesting would be completed.

165.    On December 16, 2020, Merglowski stated that Atrium was facing delays in manufacturing FOCUSfactor Products because Atrium needed three (3) ingredients: magnesium taurinate, magnesium malate, and choline bitartrate. These were all ingredients that Atrium often used in other products that it manufactured in its facilities.

166.    On December 17, 2020, Merglowski emailed Synergy stating that Atrium wanted to improve its processes as it heads into the next year by "resetting for 2021". According to Atrium, this meant moving all of Synergy's 2020 backorders to be produced at the beginning of the third quarter of 2021. Wasson stated that this "resetting" was necessary and needed "to be done as it will help [Atrium] help [Synergy]" and that this would somehow help Atrium track Synergy's purchase orders better and also have a clearer picture of the demand for 2021.

167.    However, this restructuring was problematic to Synergy and would likely contribute to their already back ordered purchase orders to be further back logged.

168.    On December 22, 2020, in an email to Synergy, Merglowski stated that there were issues with procuring raw materials. Specifically, she stated that there were delays in procuring the following ingredients: "magnesium malate," "magnesium aspartate", and "zinc chrebbs."

169.    On the same date, Frank Romano ("Romano"), on behalf of Atrium, emailed Synergy and stated that Atrium's suppliers were struggling to procure certain raw materials, which was the direct cause for the ongoing delays in production and shipment of the FOCUSfactor

Products. These same ingredients were used by Atrium to manufacture other products within its facilities.

170.    On or around December 30, 2020, Atrium asked Synergy to help it source the raw materials needed to manufacture FOCUSfactor products, otherwise there would continue to be ongoing delays.

171.    Upon information and belief, this was Atrium's attempt to give the appearance that the raw material shortage was the genuine cause of the delays.

172.    On January 6, 2021, Merglowski emailed Synergy that Atrium would need to reschedule their regularly weekly phone calls because Atrium needed more information from its production department before giving Synergy a status report and that there were manufacturing delays over the holidays.

173.    On or around January of 2021, the truth as to how and why the manufacture and delivery of the FOCUSfactor Products were continuously being delayed began to reveal itself.

174.    On January 8, 2021, Merglowski emailed Synergy to state that Atrium continued "to see delays with raw materials," which was continually pushing out the production dates of FOCUSfactor Products. Furthermore, Merglowski suggested that Synergy should change the size of their tablets to an oval shape.

175.    Also on January 8, 2021, Wasson emailed Synergy and stated that changing the tablets to an oval shape would give Atrium "unfettered access to both Fetti machines" and that FOCUSfactor Products would not be competing against Atrium's own internal products or third-party brand products for those machines. Wasson further stated that using the Fetti machines would be the "better path forward to keep pace with Factors demand."

176.   This was the first time Atrium verbalized that FOCUSfactor Products were competing for the same manufacturing machines as Atrium's and/or third-party branded products.

177.   Competition between FOCUSfactor Products and Atrium's internal products—or other third-party brand products—for the same manufacturing machines were—at least partially—the true reason for the delay in the production and shipment of FOCUSfactor Products.

178.   Prior to this date, Atrium never admitted that the delays were due to the fact that Atrium was using the same manufacturing machines, raw materials, and other resources needed to produce FOCUSfactor Products for its own internal and/or third-party products.

179.   Additionally, upon information and belief, Atrium was launching (or had already launched) a product(s) that was in competition for the same machines and/or resources as FOCUSfactor Products. Therefore, Atrium wanted to bump FOCUSfactor Products off its manufacturing line in order to capitalize on the COVID-driven consumer demands for its own internal products.

180.   On January 8, 2021, upon Atrium's request for help in procurement of raw materials, Synergy quickly identified a third-party vendor that would be able to provide the raw material that Atrium purportedly did not have. Synergy advised that Atrium quickly submit a purchase order for the ingredients with the third-party vendor.

181.   On January 9, 2021, Wasson emailed Ross stating that Atrium and Nestle Global Procure were able to "jump" the line and secure 5,000 kilos of the needed raw materials and that Atrium no longer needed help in sourcing the raw materials.

182.   Upon information and belief, Atrium fraudulently mislead Synergy into believing that the delays were due to ingredient shortage when in fact Atrium had plenty of ingredients—or access to plenty of ingredients—to produce the FOCUSfactor Products timely.

183.     Nevertheless, throughout the year 2021, Atrium's delays, excuses, and lies continued.

184.     On January 13, 2021, Merglowski stated that there would be further delays because there was now a shortage in black lids, delays in blending the ingredients, and delays in shipping.

185.     On the same date and on a phone call, Wasson told Synergy that eventually Atrium would begin to outsource all labor—blending, bottling, and final packaging—to produce FOCUSfactor Products except for tableting. In the same conversation, Wasson told Synergy that Atrium simply had too much volume or purchase orders to fill and expressed that the production of ***Atrium's internal brands would take priority over FOCUSfactor Products***.

186.     On January 20, 2021, Wasson stated that Atrium was still in need of two minerals, mag citrate and choline bi-tartrate. Wasson promised that so long as they would be able to secure these raw materials, that they would be able to increase its production numbers to address the need to boost production and address the high volume of Synergy's back orders.

187.     Upon information and belief, Atrium should have been well stocked in—or had reasonable access to—mag citrate and choline bi-tartrate.

188.     On January 20, 2021, Synergy emailed Wasson and Jim Siwiak ("Siwiak") and told them that Synergy could help Atrium source any raw materials that were needed.

189.     Upon information and belief, Atrium did not take Synergy up on its offer because it knew that the raw material shortages were not true.

190.     On February 3, 2021, on a phone call, Merglowski and Wasson told Synergy that there were delays in coating the supplements, in production, and shipment.

191.    Furthermore, on the same date, Merglowski emailed Synergy and stated that there were delays in procuring black lids and that Atrium had a phone call with "Packageall" to address this shortage.

192.    On February 16, 2021, Gray emailed Synergy and stated that there were more delays in shipping due to bad weather. However, Atrium had previously promised to ship 50,400 bottles on this date, and even without the shipping delays, Atrium was not able to explain why it would be short in shipping the number of bottles it promised to deliver.

193.    On February 23, 2021, Gray emailed Synergy blaming alternative shipping carriers for the reasons for the delays.

194.    However, despite the shipping delays, Atrium was still short in the number of bottles it scheduled to ship.

195.    Whenever Synergy inquired about the shortage in shipments, Atrium provided vague non-answers.

196.    For example, when asked about the shortage, on February 23, 2021, Gray responded "a few of them had just been released from testing yesterday."

197.    On March 3, 2021, Merglowski emailed Synergy and stated that its manufacturing production ran shorter than anticipated and that there would be less pills to allocate for bottling than anticipated. Therefore, Atrium pushed back the shipping deadline once again.

198.    On March 10, 2021, Merglowski, once again and on last minute, canceled the regularly scheduled weekly phone. In her email, Merglowski sought Synergy's agreement to reallocate the bulk amounts for each FOCUSfactor Product SKU for the month of May and June.

199.    On March 11, 2021, Romano emailed Synergy stating that Atrium would need to reallocate the bulk amounts to be produced for the month of April, May, and June. Romano stated

that Atrium would only be able to produce a very low amount of FOCUSfactor Products in the month of April but would increase production in May and June.

200.    Upon information and belief, this reallocation was just another tactic to conceal the true reasons for the ongoing delays.

201.    Between March 19 to 23rd, 2021, Gray and Merglowski repeatedly told Synergy through email and phone calls that the delay in shipping FOCUSfactor Products were due to the fact that Atrium was still waiting for lab results and that the labs have been backlogged. Every time Synergy followed up on this shipment, Gray and Merglowski continued to advise Synergy that they were still waiting on the lab results. Gray and Merglowski also represented that they called the lab several times and were told that the testing delay was because it was backlogged.

202.    On March 23, 2021, Merglowski emailed Synergy with a change of story and for the first time revealed that the true reason for the delay was because the products were actually stuck in customs and therefore never made it to the lab for testing. Merglowski needed Synergy's permission to ship the products under quarantine.

203.    On March 24, 2021, Atrium continued to state that there were additional testing delays, this time Atrium was waiting for a residual solvents test to come back from the lab. Synergy continued to follow up for an update and finally on March 30, 2021, Merglowski responded that Atrium was still waiting for an update from the lab and that there were issues with the testing instrument.

204.    On March 30, 2021, Ross, on behalf of Synergy, told Merglowski and the Atrium team that Synergy was officially putting Atrium on notice of the long-term damage to Synergy's business that Atrium was causing due to these ongoing and massive delays.

205.    Furthermore, starting around April of 2021, Atrium was shipping FOCUSfactor Products with short-dated products (expiration dates of less than two (2) years).

206.    This was not discovered by Synergy until sometime later and Atrium caused Synergy's retail customers to reject and/or return the short-dated FOCUSfactor Products, which were then worthless and unmarketable.

207.    Additionally, throughout the rest of the year 2021 and into 2022, the delays and the same cycle of excuses for the delays continued on.

208.    Then on March 25, 2022, without warning, Synergy received notice from Jason Ridge, VP Technical Operations VMS from Nestle Health Science, that Atrium would no longer be able to support Synergy's business needs in manufacturing FOCUSfactor Products.

209.    Upon information and belief, Atrium's end goal was to string Synergy along while Atrium bulked up the production of its own internal supplements full-time, at which time Atrium would break ties and stop manufacturing FOCUSfactor Products for Synergy.

210.    Furthermore, Atrium continued to make the fraudulent representation that the supply chain shortages and delays were issues plaguing the entire industry—which created a false appearance for a justifiable excuse for non-performance—so that Synergy would not find an alternative manufacturer. Atrium fraudulently led Synergy to believe that using an alternative manufacturer would be futile and that Synergy would face the same shortages and delays with other manufacturers. Synergy relied on those false representations by continuing to submit purchase orders with Atrium.

211.    Atrium lied and actively concealed material facts so that Synergy would not know that the true reasons for Atrium's breach in contract was because Atrium was favoring the

production and manufacture of its own internal brand products and/or third-party products as opposed to performing its contractual obligations to Synergy.

212.    As a manufacturer and partner to Synergy, Atrium knew the secret formulas, processes, methods, and recipe in creating FOCUSfactor Products.

213.    Furthermore, Atrium had access to other proprietary information and trade secrets that were confidential, such as Synergy's business relationships, marketing plans, customer lists, contracts, and other data relevant to competing in the supplement industry.

214.    By stringing Synergy along, Atrium had a steady source of revenue from Synergy's business and could also sabotage Synergy's relationship with its key customers by causing undue delays and creating the illusion that Synergy is an unreliable business partner. In doing so, Atrium continued to gain market advantage in the industry by gaining leverage in its ability to purchase raw materials and components—that overlap with Synergy's products—at a much larger volume, thus driving down the costs of goods on their own products and at the expense of Synergy (including third-party competitors).

215.    In fact, upon information and belief, Atrium had immense access to procuring any raw materials and supplies it needed and, therefore, did not really face shortages that would justifiably cause material delays in the manufacture of FOCUSfactor Products. To the extent there was a shortage, it was a shortage that Atrium could have overcome with adequate and reasonable diligence.

216.    For example, on February 24, 2022, Synergy asked Wasson if Atrium could sell 117 KG of "sharp phosphatidylserine", an ingredient that was in short supply at the time. However, Atrium had no problem procuring this ingredient. In fact, Atrium offered to sell Synergy two

different versions of this ingredient. Atrium had 30KG to spare in one version and it had 600KG to spare in the other version.

217.    Because of the delays unilaterally caused by Atrium, Synergy received the FOCUSfactor Products ordered through the Purchase Orders SEVERAL <u>months</u> after it should have in the regular course of the parties' dealing.

218.    This delayed production and delivery by Atrium constituted a breach of its Purchase Contracts with Synergy.

219.    Atrium's delayed production and deliverance was material to Synergy.

**C.    Additional Facts Related to Damages Caused by Atrium's Delays and Breach of the Purchase Contracts**

220.    HVL PO7 sought $3,042,375 worth of FOCUSfactor Products, to be delivered 1/3 on April 30, 2021, 1/3 on May 31, 2021, and 1/3 by June 30, 2021.  With the exception of approximately $80,000 worth of product, Atrium did not start delivery of product under HVL PO7 until June 30, 2021, and did not complete delivery of product under HVL PO7 until November 5, 2021.

221.    In addition, because the manufacturing process for the FOCUSfactor Products delivered by Atrium under the Purchase Contracts was paused for months after the materials' creation, the FOCUSfactor Products delivered by Atrium under the Purchase Orders only had part of the 36-month or 30-month shelf life left when received by Synergy.

222.    For example, a lot of approximately 14,340 units of FOCUSfactor Brain and Vision, subject to purchase orders HVL PO4, HVL PO5, HVL09302020A, and HVL PO7, was not shipped by Atrium to Synergy until August 17, 2021.  The expiration date of this lot of FOCUSfactor Products was December 23, 2022, meaning that, due to Atrium's delay, Synergy had 16 of the usual 28 months of time to sell the product before it expired.

34

223.    The reduced expiration time damaged Synergy because Synergy's customers expect a shelf life of 24-30 months for FOCUSfactor Products. Many of Synergy's customers will ship unsold FOCUSfactor Products back to Synergy, expecting a full refund (including shipping and processing fees), if it has not been sold prior to at least one year being left before the product expires.

224.    Due to Atrium's unilateral delay of the manufacturing process of FOCUSfactor Products (in favor of its own products), in mid- and late-2020 Synergy ran dangerously low on its inventory of the FOCUSfactor Products (including some that ran completely out) that Atrium was responsible for manufacturing.

225.    Due to the manufacturing delay caused by Atrium, Synergy was unable to fill more than $5 million in orders for FOCUSfactor Products from Synergy's customers.

226.    In reliance on Atrium's false and negligent misrepresentations, Synergy continued to work with and submit purchase orders to Atrium.

227.    In or about March of 2022, Atrium stopped being a third-party contract manufacturer.

228.    Due to the issues caused by Atrium's unilateral and self-serving delay of the manufacture of the FOCUSfactor Products, much of the product whose manufacturing was paused by Atrium has not been sold by Synergy despite Synergy's efforts to sell it.

**COUNT I**
**BREACH OF CONTRACT**

229.    Synergy restates and realleges the foregoing Paragraphs as though fully set forth herein.

230.   Atrium's acceptance and Acknowledgments of the Purchase Orders constituted enforceable contracts between Synergy and Atrium. The Purchase Contracts were supported by consideration and mutuality of obligation.

231.   A meeting of the minds existed as to the terms of the Purchase Contracts between Synergy and Atrium.  The material terms of the Purchase Contracts between Synergy and Atrium are evidenced by the Purchase Orders, Acknowledgments, and the parties' past course of dealing in Atrium's filling of purchase orders and manufacture of FOCUSfactor Products.

232.   Among the material terms of the Purchase Contracts between Synergy and Atrium was the delivery date under "Promised Ship Dates" indicated on each respective purchase order and/or acknowledgement.

233.   Due to Atrium's unilateral and self-serving delay of the manufacture of FOCUSfactor under the Purchase Orders, Atrium delayed the delivery of FOCUSfactor Products materially beyond the date on which it had agreed to deliver the FOCUSfactor to Synergy.

234.   Atrium's delay of delivery of FOCUSfactor Products under the Purchase Contracts constitutes a breach of the Purchase Contracts between Synergy and Atrium.

235.   Atrium's breach of the Purchase Contracts between it and Synergy damaged Synergy in that, among other things:

a.   The value of the product that Synergy received from Atrium was materially diminished due to Atrium's breach;

b.   Synergy was forced to expend significant costs to obtain additional FOCUSfactor due to Atrium's breach;

c.   Synergy has incurred significant storage costs for the late-delivered product from Atrium that Synergy, to date, has been unable to sell;

     d.     Synergy missed out on significant sales to its customers due to Atrium's breach;

     e.     Synergy missed out on other potential new business opportunities due to Atrium's breach; and

     f.     Such other and further damages as may be discovered through trial.

WHEREFORE, Plaintiff Synergy CHC Corp. demands judgment against Defendant HVL, LLC d/b/a Atrium Innovations for all damages, interest, costs, and attorneys' fees.

**COUNT II**
**BREACH OF WARRANTY**

236.    Synergy restates and realleges the foregoing Paragraphs as though fully set forth herein.

237.    On or about the dates of the Purchase Orders identified above, Synergy purchased FOCUSfactor Products from Atrium.

238.    In connection with the sale, Atrium expressly promised and warranted that the goods would be manufactured and delivered with a shelf life of approximately thirty (30) to thirty-six (36) months, as described above, with manufacturing and delivery typically taking no more than two months of this period.

239.    In connection with the sale, Atrium impliedly promised and warranted that the FOCUSfactor Products would be merchantable and conform to the descriptions as provided in the Purchase Contracts, including but not limited to having a shelf life of approximately thirty (30) to thirty-six (36) months, with manufacturing and delivery typically taking no more than two months of this period, be of fair average quality, and be fit for the ordinary purposes for which products of this type are used.

240.    Atrium breached these express and implied warranties in that the goods were delivered with significantly less shelf life – as low as twelve (12) months, which rendered the FOCUSfactor Products defective and not of fair average quality.

241.    Synergy notified Atrium of the nonconformities in the goods within a reasonable time after Synergy discovered the breach.

242.    As a result of Atrium's breach of implied and express warranties, Synergy has suffered significant and material damages, which represent the difference between the value of the goods as delivered and the value they would have had if they had been as warranted.

WHEREFORE, Plaintiff Synergy CHC Corp. demands judgment against Defendant HVL, LLC d/b/a Atrium Innovations for all damages, interest, costs and attorneys' fees.

## COUNT III
## NEGLIGENT MISREPRESENTATION

243.    Synergy restates and realleges the foregoing Paragraphs as though fully set forth herein.

244.    Atrium failed to exercise due care communicating information to Synergy as described above, which Synergy justifiably relied and acted on as true.

245.    Synergy's resulting damages were proximately caused by Atrium's negligence and carelessness as described above, including but not limited to, Atrium's failure to:

a.  properly, truthfully, and accurately describe Atrium's intentions with regard to the Purchase Contracts and the production of FOCUSfactor Products, and the extent of the delays with regard to the production and delivery of the FOCUSfactor Products;

b.  properly, truthfully and fairly describe Atrium's priorities with respect to the production of Atrium's own products—or third-party brand products—over the production of FOCUSfactor Products;

c.  properly, truthfully and fairly communicate to Synergy Atrium's intentions to discontinue production of FOCUSfactor Products; and

d.  otherwise use due care under the circumstances.

WHEREFORE, Plaintiff Synergy CHC Corp. demands judgment against Defendant HVL, LLC d/b/a Atrium Innovations for all damages, interest, costs and attorneys' fees.

**COUNT IV**
**FRAUDULENT MISREPRESENTATION**

246.   Plaintiff restates and realleges the previous Paragraphs as though fully set forth herein.

247.   When Synergy inquired about the production delays, Atrium repeatedly and falsely represented and communicated to Synergy that deliveries of product pursuant to the Purchase Contracts were imminent; that Atrium was prioritizing the production of FOCUSfactor Products so that it could timely produce and deliver the FOCUSfactor Products pursuant to the Purchase Contracts; and, that the delivered products would conform to the product descriptions and pursuant to Purchase Contracts.

248.   The delay of Atrium's production and delivery of the nonconforming FOCUSfactor Products until several months after the expected and promised dates, made clear that deliveries of the FOCUSfactor Product for the pending Purchase Orders were not in fact imminent, that Atrium did not in fact prioritize the manufacturing or delivering of the FOCUSfactor Products during the promised timeframes, and that Atrium did not intend to continue manufacturing FOCUSfactor Products in 2022.

249.   Furthermore, in order to string Synergy along, Atrium continued to lie and make various false excuses—such as, but not limited to, raw material and supply shortages, labor shortages, truck shipping delays, lab testing delays, and third-party vendor delays—as to the

39

reasons for the delays in shipping and delivering FOCUSfactor Products in accordance with the Purchase Contracts.

250.    Atrium made these false representations of material facts with knowledge of their falsity or in reckless disregard of whether they were true or false.

251.    Atrium's false representations were made for the purpose of inducing Synergy to continue to do business with Atrium, and to gain a market advantage with regard to Atrium's own brand, and Synergy justifiably relied on Atrium's representations. Atrium's false representations were also made with the intent to create the illusion of a justifiable excuse for its non-performance and breach of the Purchase Contracts.

252.    These false representations are representative of a pattern of fraud committed by Atrium. *See supra* ¶¶ 67-78; 81-84; 95-98; 102-107; 113-122; 128-170; 174-196.

253.    Synergy in fact relied upon the material representations made by Atrium as true and acted upon them to its damage by continuing to submit purchase orders to Atrium and delaying any action to find an alternative manufacturer while waiting for the FOCUSfactor Products to be delivered to the detriment of Synergy.

254.    Atrium knew or should have known that Synergy would rely on Atrium's representations.

255.    Atrium acted with malice and/or recklessly disregarded its contractual obligations and promises that it made to Synergy in order to gain a market advantage with regard to Atrium's own brand, disrupt Synergy's relationship with its existing customers, and wreck Synergy's reputation.

256.    Atrium acted with malice and/or reckless disregard when it knew that its own products would gain a market advantage if it sabotaged Synergy's ability to fill customer orders and cause Synergy to incur millions of dollars in costs.

257.    Additionally, Atrium acted with malice and/or reckless disregard when it made the decision to delay the production and shipment of FOCUSfactor Products and then eventually discontinue manufacturing FOCUSfactor Products. Atrium continued to give Synergy false assurances in order to delay and/or prevent Synergy from submitting purchase orders with an alternative manufacturer.

258.    If Synergy had known the truth, Synergy would have sought an alternative third-party manufacturer in the Spring or Summer 2020, and it would not have continued to submit purchase orders to Atrium.

259.    The false representations to Synergy deprived Synergy of the information it needed to make a sound business judgment, caused Synergy to be unable to fill customer orders and other customer problems, caused Synergy to incur costs to store non-conforming product that it cannot sell, and caused Synergy to incur millions of dollars in damages and unnecessary delay that it would not have incurred but for Atrium's fraudulent misrepresentations.

WHEREFORE, Plaintiff Synergy CHC Corp. demands judgment against Defendant HVL, LLC d/b/a Atrium Innovations for all damages, including punitive damages, interest, costs and attorneys' fees.

## COUNT V
## FRAUDULENT CONCEALMENT

260.    Synergy restates and realleges the previous Paragraphs as though fully set forth herein.

261.    Atrium actively concealed and failed to disclose to Synergy that the true reason for the delays in producing FOCUSfactor Products was because Atrium was prioritizing the manufacture, production, and/or shipment of its own internal products and/or other third-party products.

262.    Atrium actively concealed and failed to disclose to Synergy that Atrium could produce FOCUSfactor Products in accordance with the Purchase Contracts, including the promised shipment deadlines, had Atrium not used its resources, labor, and materials towards its own internal products and/or other third-party products.

263.    Atrium actively concealed and failed to disclose to Synergy that its plan was to bulk up the manufacture and production of its own internal products and that as a part of this ploy, Atrium would breach its contractual obligations under the Purchase Contracts under the false guise of excusable nonperformance in order to sabotage Synergy's relationship with its customers so that Atrium could have a market advantage over Synergy once it stops producing FOCUSfactor Products for Synergy.

264.    Atrium actively concealed and failed to disclose to Synergy that its end goal was to squeeze out Synergy and/or FOCUSfactor Products in the supplement industry in order to gain leverage in the market.

265.    Atrium actively concealed the aforementioned information by providing vague, evasive, false, and misleading information in order to distract Synergy from the discovery of the true reasons for the delays and material breaches of the Purchase Contracts.

266.    Atrium also actively concealed material facts by canceling regularly scheduled meetings, failing to always respond to Synergy's request for updates and information, and failing to always provide scheduling reports for production and/or shipping dates.

267.    Additionally, Atrium purposefully failed to provide and actively concealed the release and shipping paperwork for the FOCUSfactor Products that were shipped with short dating in order to prevent Synergy from identifying this problem in advance.

268.     Furthermore, Synergy during the weekly calls with Atrium, Ross repeatedly asked Atrium (Merglowski, Gray, and Wasson) if there was anything else that Synergy needed to know that would be material to Atrium's performance under the Purchase Contracts.

269.     Despite Ross' regular inquiries, Atrium continued to actively conceal pertinent and material information that were directly relevant to Atrium's performance and obligations under the Purchase Contracts.

270.     Atrium had a legal duty to disclose all the aforementioned material facts to Synergy pursuant to Atrium's contractual obligations and promises it made to Synergy pursuant to the Purchase Contracts.

271.     Furthermore, upon information and belief, Synergy trusted Atrium with confidential information and trade secrets as it relates to the manufacturing and production of FOCUSfactor Products, which Atrium used to its own advantage.

272.     Atrium fraudulently concealed material facts in order to induce Synergy into continuing to rely on Atrium and prevent Atrium from finding another manufacturer to produce FOCUSfactor Products.

273.     But for Atrium's fraudulent concealment of material facts, Synergy would not have entered into the Purchase Contracts and continued to submit additional purchase orders. Synergy relied on Atrium's representation that it would produce FOCUSfactor Products pursuant to the terms of the Purchase Contracts and/or that it would produce FOCUSfactor Products imminent to deadlines Atrium continued to push back.

274.     Furthermore, in order to string Synergy along, Atrium continued to lie and make various false excuses—such as, but not limited to, raw material and supply shortages, labor

43

shortages, truck shipping delays, lab testing delays, and third-party vendor delays—for the delays

in shipping and delivering FOCUSfactor Products in accordance with the Purchase Contracts.

2Atrium fraudulently concealed material facts with the purpose and intention of inducing Synergy

to continue to do business with Atrium, and to gain a market advantage. Synergy justifiably relied

on Atrium's representations by continuing to submit purchase orders to Atrium, and delaying, at

least initially, any action to find an alternative manufacturer while waiting for the FOCUSfactor

Products to be delivered to the detriment of Synergy.

275.    Atrium also actively concealed material information in order to convince Synergy

that the material delays were for justified reasons that were outside its control.

276.    These fraudulent concealments are representative of a pattern of fraud committed

by Atrium. *See supra* ¶¶ 67-78; 81-84; 95-98; 102-107; 113-122; 128-170; 174-196.

277.    Atrium acted with malice and/or recklessly disregarded its contractual obligations

and promises that it made to Synergy in order to gain a market advantage with regard to Atrium's

own products, disrupt Synergy's relationship with its existing customers, and wreck Synergy's

reputation.

278.    Atrium acted with malice and/or reckless disregard when it knew that its own

products would gain a market advantage if it sabotaged Synergy, a company that is in competition

for the same resources, labor, and equipment.  .

279.    Additionally, Atrium acted with malice and/or reckless disregard when it made the

decision to delay the production and shipment of FOCUSfactor Products and then eventually

discontinue manufacturing FOCUSfactor Products. Atrium continued to give Synergy false

assurances in order to delay and/or prevent Synergy from submitting purchase orders with an

alternative manufacturer.

280.    If Synergy had known the truth, Synergy would have sought an alternative third-party manufacturer in the Spring or Summer 2020, and it would not have continued to submit purchase orders with Atrium.

281.    The fraudulent concealments deprived Synergy of the information it needed to make a sound business judgment, caused Synergy to be unable to fill customer orders and other customer problems, caused Synergy to incur costs in storing non-conforming product that it cannot sell, and caused Synergy to incur millions of dollars in damages and unnecessary delay that it would not have incurred but for Atrium's fraudulent misrepresentations.

WHEREFORE, Plaintiff Synergy CHC Corp. demands judgment against Defendant HVL, LLC d/b/a Atrium Innovations for all damages, including punitive damages, interest, costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Synergy CHC Corp. demands judgment against Defendant HVL, LLC d/b/a Atrium Innovations and requests that:

1.    Synergy be awarded its damages, including compensatory damages, incidental and consequential damages, and punitive damages, for the claims as described herein;

2.    Synergy be awarded its costs, as may be allowable by law;

3.    Synergy be awarded its attorneys' fees, as may be allowable by law;

4.    A trial by jury; and

5.    Such other and further relief as the Court may determine.

Dated:  <u>April 28, 2023</u>

Respectfully submitted,
SYNERGY CHC CORP.
By Its Attorneys
Drummond Woodsum

   /s/  Mark V. Franco
<u>                         </u>
Mark V. Franco, Esq.
Amanda B. Lynch, Esq.

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME 04101
Tel. (207) 772-1941
<u>mfranco@dwmlaw.com</u>
<u>alynch@dwmlaw.com</u>

   /s/  John E. Branch, III
<u>                         </u>
John E. Branch, III, Esq.  (pro hac vice)

**NELSON MULLINS RILEY &**
**SCARBOROUGH, LLP**
4140 Parklake Ave., 2nd Fl.
Raleigh, NC  27612
Tel: (919) 329-3800
<u>john.branch@nelsonmullins.com</u>